## Rizzardi License

*William D. Balitas*, for appellant.
*Frederick H. Hobbs*, for Commonwealth.

STAUDENMEIER, J., June 7, 1965. — This matter comes before the court on an appeal from the action of the Secretary of Revenue in suspending appellant's motor vehicle operator's license as of November 11, 1964, for alleged incompetency "until sufficient proof of competency is established."

Section 618(a) of The Vehicle Code of April 29, 1959, P. L. 58, 75 PS §618(a), provides:

"(a) The secretary may suspend the operating privilege of any person, with or without a hearing before the secretary or his representative, upon receiving a record of proceedings, if any, in which such person pleaded guilty, entered a plea of nolo contendere, or was found guilty by a judge or jury, or whenever the secretary finds upon sufficient evidence:

"(1) That such person is incompetent to operate a motor vehicle or tractor, or is afflicted with mental or physical infirmities or disabilities rendering it unsafe for such person to operate a motor vehicle or tractor upon the highways."

The Secretary of Revenue acted upon receipt of a report given by Sergeant Michael P. McGearty of the Pennsylvania police, to the effect that on the evening of October 6, 1964, he stopped appellant for exceeding the 60 mile speed limit on Route No. 176, a concrete highway extending from Morgantown to Reading, he intended to give appellant an immediate hearing at an alderman's office in the City of Reading. The officer testified as follows:

"A. . . . I requested him to follow the patrol car into the alderman's office, which he refused to do. I asked him to lock the car up because a lot of lucrative stuff he had in his car, and he refused. I asked him to put it in the trunk and he refused to do that. We then got in the patrol car and proceeded to the City of Reading and, as we got into Reading, he made the remark, 'I left $2,000 in the car.' Whereupon I turned around

and went back to his car and walked up to the car and while I was walking up with him, his next remark was, 'I have to have a bowel movement.' So I showed the gentleman to a spot to go in the weeds. After he relieved himself he came back and sat on the side of the highway and refused to move. I placed him in the patrol car and took him to the alderman at the edge of the city. As soon as they started the proceeding, Mr. Rizzardi slid out of the chair and began pounding the floor and pounding with his fists, screaming that his leg hurt. The alderman then said, 'I can't hold a hearing due to the conditions that exist at the present time.' He told me to take him to the Reading Hospital. On the way out of the alderman's house we had to pass through his living room and going through the living room, Mr. Rizzardi took his arm and cleaned the top of the television off of several pictures and ornaments. Then I took him to the hospital and we arrived at the Reading Hospital, which was quite close by, in about five minutes. We went in and I told the nurse the conditions we had. She came out with a wheelchair. We went in, the appellant, the nurse and myself. He was placed in bed and they called the interns, and the interns examined him and found nothing wrong with him as far as they knew as far as his leg was concerned. He then started to holler and scream again with the result that it took five people to hold him down to the bed so he could be shackled to bed. The intern gave him an injection which failed to knock him out. He gave him another injection, a stronger injection, which put him to sleep. The next day I read he was admitted

. . .

"Mr. Balitas: Just a minute. Not what you read; what you know.

"The Witness: Three days later I visited the hospital again. At that time he had been taken to the psychiatric ward where he had been admitted as a patient. I

was unable to talk to Mr. Rizzardi. Then within a space of several days he had been discharged from the hospital.

"Q. And, officer, in view of what you describe, did you recommend that the appellant's operating privileges be suspended on the grounds that he is incompetent to operate a motor vehicle?

"A. Yes, sir, I did." (t. 4-5)

Upon the officer's recommendation appellant's operator's license was suspended.

Commonwealth failed to offer any medical record to the effect that appellant is incompetent to operate a motor vehicle; neither was any testimony introduced showing that appellant pleaded guilty, entered a plea of nolo contendere, or was found guilty by a judge or jury.

Counsel for the Commonwealth offered in evidence "upon the express direction of the Bureau of Traffic Safety a general neurological and psychological report of Doctor Edgar F. Bechtel, M. D., under date of February 19, 1965."

Doctor Bechtel's report states, inter alia, that at the time of examination appellant "was perfectly well, composed and cooperative. There was no evidence to indicate emotional instability. He is fully employed with a good work record with no missed time. . . . has no apparent physical neurologic or psychiatric defect at this time such as to prevent reasonable control of a motor vehicle."

Appellant testified that he graduated from high school, is married, attended an electronics school when he was in the service, after which he joined the merchant marine, and attended the engineering license school and attained the rank of second class engineer. He is employed by Sun Oil Company as an engineer; there are seven men over whom he has supervision. He takes "care of the machinery down in the engineroom,

maneuver the ship when we have to maneuver, repair any equipment while we are under way, take care of turbulence or pumps and seafaring equipment." (t. 11) He has been in the employ of Sun Oil Company for 10 years and has never missed any work.

He further testified that he had been at sea and arrived at Marcus Hook port in Pennsylvania about 6:30 or 7 p.m., he had been awake and on his feet about 48 or 50 hours before he got off the ship.

His version as to what transpired on the evening in question follows:

"Q. Now you heard the officer testify something about you had $2,000 in the car?

"A. It wasn't $2,000; it was close to it. I don't know exactly the amount because it was given to me in an envelope and it was for the debts of a man on the ship, gambling debts, that I was supposed to deliver to the man when I got off. I didn't know; I didn't know until I got home and I had telephoned my wife that the money was there. I was very worried because I didn't know how to replace it.

"Q. So you thought this money was in the car when you told the officer about it?

"A. Yes, sir.

"Q. And then you found out when you went back to the car it wasn't there?

"A. Yes.

"Q. Were you upset about this?

"A. Yes, very upset.

"Q. Were you worried about being stopped by the police?

"A. Well, I was worried about the money. It was illegal. It was gambling money and I knew that.

"Q. Do you mean the men of the ship gambled and they trust you and let you hold their money?

"A. Well, at that time they did.

"Q. Did anything happen to your leg that day?

"A. Yes, sir, it did. After I came up, after I was stopped, my leg went numb. I thought it just went to sleep. I had that feeling before. I don't know, after trying to arouse it, it didn't come around. After a considerable amount of time I began to get worried about it and then with all the things pressuring me on my mind, I asked to see a doctor. I never felt so thwarted or helpless. I didn't have any friends or anybody who knew me and, of course, the officers were anxious to get me in and out of that hearing as quick as they could. I complained about my leg but I didn't pound any floor down there in the alderman's office. I was yanked to my feet. I didn't resist going into the automobile. I tried to answer them as best I could, but I couldn't stand on my leg and I was half dragged and pushed into the car, and as far as in the alderman's office, I did argue and became very violently angry when they wouldn't believe me. It was no pain but I couldn't just exactly understand what was wrong with it, but I know there was something drastically wrong. Then finally, when I was going to be taken over to the hospital, I wouldn't give them any cooperation at all, and they were finally taking me to the doctor and on the way out, I stumbled again and I guess it was the television or something there with things on it and I knocked some of the things off the top. Later they had taken me to the hospital and put me in a wheel chair, and I asked them to get in touch with Dr. Zahner from Orwigsburg, who is my family physician. I didn't know this doctor from Reading there this, Dr..........

"Q. Dr. Horst?

"A. Dr. Horst. I didn't know him at all and I was still excited and I was worried about the worry it would cause my wife when she heard I was in the hospital coming up from work. I was trying to tell them to get Dr. Zahner. I was shouting about it; I wasn't very calm about it. The doctor did give me a shot. I don't remem-

ber the second one; I remember the first. I don't remember the second one, if there were two.

"Q. Had you ever had anything like that before?

"A. No, sir.

"Q. Have you ever had anything since this day like that?

"A. No, sir.

"Q. You haven't missed any work?

"A. No, sir." (t. 12-13-14-15)

Appellant has been operating motor vehicles when on shore since November 1964, his appeal having acted as a supersedeas.

At the hearing before us on April 23, 1965, his demeanor was calm and collected; there were no apparent manifestations of emotional instability. His replies to questions propounded to him were clear and lucid. His position with Sun Oil Company is a responsible one. The fact that he has not missed work in 10 years weighs heavily in his favor.

Taking the entire record into consideration we must conclude that the suspension of his operating privileges is unwarranted and is without basis in fact or law, that the Commonwealth has failed to offer sufficient proof of incompetency. See Commonwealth v. Sechrist, 9 Lebanon 271 (1963).

And now, June 7, 1965, the appeal is sustained and the action of the Secretary of Revenue is reversed.

And now, June 7, 1965, upon motion of counsel for the Commonwealth, an exception is noted.